# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SEQUEL CAPITAL, LLC, )<br>      Plaintiff, )<br>)<br>v. )<br>)<br>WILLIAM PEARSON, ANTHONY )<br>GRAFFIA, SR., and ANTHONY GRAFFIA, JR., )<br>Defendants. )<br>_____ )<br>)<br>WILLIAM PEARSON and ARGUS )<br>INDUSTRIES, INC., )<br>      Third-Party Plaintiffs, )<br>)<br>v. )<br>)<br>HARTFORD COMPUTER CORP., ET AL., )<br>      Third-Party Defendants. ) | CASE NO.: 07-CV-2642<br><br>District Judge Robert M. Dow, Jr. |

## MEMORANDUM OPINION AND ORDER

Third-Party Defendants Rally Capital Services, LLC ("Rally") and Howard Samuels (collectively referred to as the "Rally Defendants") seek dismissal [65] of Count I of the operative complaint.[1] For the following reasons, the Court denies the Rally Defendants' motion to dismiss [65].

---

[1] The Rally Defendants originally sought dismissal of Counts I, II, and IV of the Third Amended Complaint, but the Fourth Amended Complaint – the operative complaint – only alleges one count of breach of fiduciary duty (Count I) against the Rally Defendants. The Fourth Amended Complaint alleges six causes of action against Third-Party Defendants Hartford Computer Group, Inc. ("Hartford"), Anthony Graffia, Sr., Anthony Graffia, Jr., and Impero Electronics, Inc. (collectively referred to as the "Hartford Defendants") – the four counts alleged in the Third Amended Complaint (Tortious Interference with Contract, Fraud, and two counts of Fraudulent Transfer) plus two new counts for Tortious Inducement of Breach of Fiduciary Duty (Count II) and conversion (Count VII). The Hartford Defendants have filed a motion for judgment on the pleadings as to all Counts (II, III, IV, V, VI, and VII) asserted against them, which the Court will address in a separate opinion.

## I. Background

### A. Procedural History

On September 15, 2009, the Rally Defendants filed the instant motion to dismiss [65], and on September 22, 2009, the Hartford Defendants filed their motion for judgment on the pleadings [75]. On November 16, 2009, Third-Party Plaintiffs William Pearson and Argus Industries, Inc. filed their response to the Hartford Defendants' motion for judgment on the pleadings, but failed to file a response to the Rally Defendants' motion to dismiss. On November 23, the Rally Defendants filed their reply. Then, on February 3, 2010, Third-Party Plaintiffs filed a motion for leave to file a Fourth Amended Complaint [105], which the Court granted. The Court gave Third-Party Defendants additional time to modify their previously filed motions to dismiss and for judgment on the pleadings to fit the allegations in the new complaint. The Rally Defendants and the Hartford Defendants filed additional briefs, and Third-Party Plaintiffs filed their combined reply [120-2] to the additional arguments on March 2, 2010. The Rally Defendants filed their surreply [123] on April 9.

### B. Factual Background[1]

Third-Party Plaintiff Argus Industries, Inc. ("Argus") manufactured, imported, and distributed digital cameras for sale to retailers, including Wal-Mart and Office Max. Third-Party Plaintiff Bill Pearson ("Pearson") was the president and sole owner of Argus. Argus' business model, like that of many importers, relied on international letters of credit to drive its business. The letters of credit were typically secured by goods purchased from the overseas manufacturer via a purchase order. Upon receipt of a letter of credit, the overseas manufacturer would ship

---

[1] The relevant facts are derived from Third-Party Plaintiffs' Fourth Amended Complaint (referred to as "the complaint") because, on a motion to dismiss, the Court accepts as true the well-pleaded factual allegations in the complaint. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006).

cameras to Argus, or would "drop-ship" Argus-brand cameras directly to the retailers. The retailers then would pay Argus by depositing funds in a drop-box at the lender's bank.

In April 2002, Sequel Capital, LLC ("Sequel") agreed to lend $2,000,000 to Argus. In November 2002, Sequel agreed to lend Argus an additional $1,000,000, bringing Argus's total debt to $3,000,000. Sequel's loan was secured by a security interest in a designated portion of Argus's inventory (cameras). Argus also borrowed approximately $1.3 million from J.P. Morgan Chase & Co. ("Chase") to support its international business operations. However, Chase and Sequel agreed that Sequel had a priority position over Chase with respect to Argus's camera inventory.

In November 2002, Office Max cancelled an order, leaving Argus with approximately $1.5 million worth of goods "in transit," and also withheld payments allegedly due, causing Argus to default on its loans with Chase and Sequel. Following the Office Max cancellation, Chase elected to seek immediate repayment from Argus on the letter of credit and its other advances to Argus. According to the complaint, at the time that Chase elected to seek immediate repayment from Argus, Argus was operating profitably but did not have the liquid funds to pay Chase upon demand. In May 2003, a representative of Chase introduced William Pearson, Argus's President and CEO, to Anthony Graffia, Sr. and Anthony Graffia, Jr. According to the complaint, Graffia Jr. informed Pearson that Graffia Jr.'s company, Defendant Hartford Computer Group, Inc., had more than enough liquid capital on hand to float Argus's need for capital for immediate inventory, satisfy the Chase and Sequel credit facilities, and provide working capital for Argus's continued operations. Fourth Amended Complaint ("Compl.") at ¶ 15.

Through Chase and the Hartford Defendants, Pearson was introduced to Rally Capital and its principals, James Zec[2] and Howard Samuels. Rally was presented as an experienced trustee for the reorganization of distressed businesses. *Id*. at ¶ 22. Once these introductions were made, the discussions evolved from turning around the Argus operation into creating a prepackaged assignment for the benefit of creditors in which the Hartford Defendants would acquire the assets of Argus and then Rally would use the proceeds to pay Argus's creditors in full. According to the complaint, the Rally Defendants "had a longstanding approach to assignments that benefited them and worked to the detriment of both assignors and outside creditors." *Id*. at ¶ 24. The complaint alleges that "Samuels and Zec [ ] told Pearson in mid-June 2003 that they had a fail-safe method for conducting assignments virtually guaranteed to result in full payment of creditors and a surplus to the assignor." *Id*. The complaint further alleges that Samuels and Zec described the method to Pearson, which involved selling the assigned company to a buyer for a set sum and allowing the buyer to begin operating the assigned entity, then offering the assets at auction to determine whether the assets at issue would sell for more than the agreed-upon price. *Id*. According to the complaint, Samuels and Zec told Pearson that if no bids higher than the agreed price were received, the assets would remain with the original buyer. *Id*. Third-Party Plaintiffs allege that "Samuels and Zec had a duty to disclose that this method, first selling the company to a buyer for a firm price, letting the buyer operate the company, and then setting up an 'auction'[,] was guaranteed to fail." *Id*. at ¶ 25.

On June 17, 2003, Pearson (on behalf of Argus) executed a Trust Agreement and Assignment for the Benefit of Creditors with James Zec, of Rally Capital Services LLC, who was to serve as assignee/trustee. The agreement indicated that Argus was indebted to various

---

[2] James Zec was a principal of Rally until his death. In the complaint, Third-Party Plaintiffs indicate that they have dismissed him as an individual defendant due to the insolvency of his probate estate.

entities, unable to pay its debts, had decided to discontinue its business, and desired "to transfer its property to an assignee for the benefit of its creditors so that the property so transferred [would be] expeditiously liquidated and the proceeds therefrom fairly distributed to its creditors without any preference or priority, except such priority as established and permitted by applicable law." Rally Def. Ex. A-1. Then on June 27, 2003, Zec, in his capacity as trustee/assignee, entered into an Agreement and Bill of Sale with Hartford for the sale of Argus's assets to Hartford for $2.5 million as well as a collection agreement in which Hartford would collect Argus's existing receivables and earn a thirty percent fee in return. Both Sequel and Chase had options not to release their security interests. Zec advertised the sale to the general public and sent the notices of the assignment and sale to all known Argus creditors on June 26, 2003.

According to the complaint, two companies, Sequel (an Argus creditor) and Ruian (an Argus supplier), submitted term sheets and told the Rally Defendants that they were willing to pay significant sums upfront and provide substantial debt financing, none of which Hartford was willing to provide. This was allegedly confirmed in a letter to Pearson from John Iwanski, Sequel's Chief Financial Officer, on June 4, 2003. Pearson provided the letter to Rally in connection with the assignment, and Rally, through Zec and Samuels, promised to seriously consider Sequel's competing offer for the assets. Ruian submitted a term sheet and said it would appear and participate in the auction. According to the complaint, either bid would have fully satisfied Argus's debts, both to Sequel and to Chase, and released the guarantee which is the subject of this lawsuit. However, neither Sequel nor Ruian submitted bids.

The complaint alleges that during May and June of 2003, "Rally, Hartford, and Graffia all stated the following to Pearson, Ruian, and Sequel: (a) [t]hat Hartford had purchased the

5

company for more than $2.5 million, along with operating capital to continue Argus' operations; (b) [t]hat the purchase price would be sufficient to pay all outstanding secured debt [and] [t]hat this would have the effect of satisfying the guarantee; (c) [t]hat Hartford would continue to bid increasing amounts against all bidders in order to secure ownership of Argus, such that other bidders appearing at the auction would be futile; [and] (d) [t]hat Hartford would continue to operate Argus." *Id*. at ¶ 29. According to Third-Party Plaintiffs, these representations were repeated by Zec and the Graffias "often," both in person and by telephone, from June 17, 2003 through July 2, 2003. *Id*. at ¶ 30. According to the complaint, on at least two occasions, on or about June 17 and June 20, 2003, one of the Graffias told Pearson that there were no obstacles to completing the deal. This was echoed by Zec, "who told Pearson that a buyer with possession of the assets was in a far better position than one that would be moving in after Hartford had owned and operated the company for a month, emphasizing how disruptive a second transition would be." *Id*. at ¶ 31. The complaint alleges that the purpose behind these statements was to foreclose bidding and assure that Hartford would be able to keep Argus's assets.

According to the allegations, Pearson relied on these statements and did not oppose the Hartford sale or undertake extraordinary efforts to assure that bidders would appear for the auction. In further reliance on these statements, Pearson also told Ruian and Sequel that he would be inclined to accept employment with Hartford and not the competing bidders. On July 11, 2003, the date of the "auction," at the posted time for the auction, no bidders appeared and no competing offers were made. *Id*. at ¶ 33. The complaint alleges that Sequel and Ruian later told Pearson that they had not submitted bids because the Graffias and Zec had told them Hartford was prepared to outbid them at any price. *Id*.

The complaint alleges that Hartford was not prepared to outbid the other potential investors, but conspired with the Graffias and Zec to assure that Hartford would be the only buyer at dramatically reduced prices. Days before the scheduled date of sale, Anthony Graffia, Sr. announced that Hartford's due diligence had turned up irregularities in inventory and receivables and thus Hartford was withdrawing from the asset purchase agreement. The complaint alleges that this fact was not made known to anyone other than Rally until the date of the auction. Following the auction (at which no bidders appeared), the complaint alleges that Zec and the Graffias entered into "closed-door" negotiations. *Id.* at ¶ 35. Then, on July 15, 2003, Hartford purchased Argus's assets from the trustee for $1.3 million. All parties present at the auction, including Third-Party Plaintiffs, the trustee, and the secured creditors, assented to the sale. The trustee then tendered $1.3 million to Chase, fully satisfying Argus's outstanding loan from Chase. In order to close the sale, Anthony Graffia, Sr. told Sequel that there were sufficient assets, inventory, and receivables remaining in the Argus estate such that continued operations would provide a revenue stream from which Sequel's secured note would be satisfied. *Id.* at ¶ 36. Sequel agreed to a continuing payment from the ongoing Argus operation of 30% of its net revenue until the note was satisfied. *Id.* Hartford also entered into an agreement with Rally to pay a certain portion of the Argus's revenue stream to the trustee until other creditors' claims were fully paid. *Id.*

The complaint alleges that, "[o]n information and belief," the Graffias and Hartford had no intention to pay any revenue from the Argus operation to Sequel or any other secured lender. *Id.* at ¶ 37. Instead, the Graffias and Hartford intended to strip the Argus assets at the first opportunity and leave the secured lenders and Pearson without any recourse. *Id.* After the closing, in September 2003, Anthony Graffia (the complaint does not specify whether it was Sr.

7

or Jr.) told Pearson and Sequel that Hartford had discovered that the Argus receivables and inventory were misreported. *Id*. at ¶ 38. The complaint alleges that the overstatements resulted from the Graffias not allowing returns to be shown as inventory. According to the complaint, "all of the pre-assignment receivables remained valid, including a receivable represented by the lawsuit against OfficeMax," and Hartford was required to pay Sequel and the trustee (on behalf of Argus's creditors) 70% of the receipts on pre-assignment receivables. *Id*. at ¶ 40. The complaint alleges that Pearson discovered that, instead of collecting and remitting on these receivables, Hartford was instead discounting and forgiving such receivables, without notice to Sequel, the trustee, or Argus's other creditors, in return for customers' orders of non-Argus product from other Hartford subsidiaries. For example, the complaint alleges "on information and belief" that a significant receivable to CompUSA was wiped off the books in return for substantial purchases of VisionTek computer graphics cards. *Id*. Instead of showing the write-off as a debt of VisionTek to Argus, Hartford, through the Graffias, simply showed the receivable as "uncollectable." The complaint further alleges that the Graffias convinced Sequel to forgo its right to participate in Argus revenue by submitting a doctored accounting to support their position and that the Graffias misrepresented the receivables and inventory to Sequel in order to retain all of the revenue generated by the Argus assets. Argus and Pearson allege that due to Hartford's misrepresentations, Sequel demanded payment from Pearson on his guarantee and filed the instant action.

The complaint alleges that some time after the sale to Hartford, Zec died and Rally named Samuels as successor trustee. In November 2003 and April 2004, Rally agreed to terminate Hartford's obligation to pay a continuing percentage of Argus's revenue for the benefit of Argus's remaining creditors. The stated basis was the supposed "overreporting" of the Argus

inventory and receivables. *Id*. at ¶ 43. The complaint further alleges, "[o]n information and belief," that the trustee did not demand an accounting to demonstrate that the Argus inventory and receivables were overreported but rather took at face value Hartford's assurances that the inventory and receivables were short and did not independently investigate the Graffias' representations. *Id*. at ¶ 44.

## II.     Legal Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. See *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Svcs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 569 n. 14). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 546. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (citations, quotation marks, and brackets omitted). The Court

accepts as true all of the well-pleaded facts alleged by the plaintiff and all reasonable inferences that can be drawn therefrom. See *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005).

Where a complaint sounds in fraud, the allegations of fraud must satisfy the heightened pleading requirements of Rule 9(b). Fed. R. Civ. P. 9(b); see also *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Rule 9(b) of the Federal Rules of Civil Procedure creates exceptions to the federal regime of notice pleading and specifies that, for "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The rule is designed "to force a plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). To that end, the "circumstances" of fraud that a plaintiff must include in her complaint are "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Svcs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008) (quoting *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1075 (7th Cir. 1997)); *Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 523-24 (7th Cir. 1993); see also *Borsellino,* 477 F.3d at 507 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990) (noting that the complaint must allege the "the who, what, when, where, and how: the first paragraph of a newspaper story."). "Read together, Rule 9(b) and Rule 8 require that the complaint include the time, place and contents of the alleged fraud, but the complainant need not plead evidence." *Amakua Development LLC v. Warner*, 411 F. Supp. 2d 941, 947 (N.D. Ill. 2006) (citing *Nissan Motor Acceptance Corp. v. Schaumburg Nissan, Inc.*, 1993 WL 360426, at *3 (N.D. Ill. Sept. 15, 1993)). A fraud claim cannot be based on "information and belief" unless the plaintiff "states

the grounds for his suspicions." *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992).

In considering a motion to dismiss or for judgment on the pleadings, courts should consider the "pleadings," which include the complaint, answer, and any written instruments attached as exhibits. *In re Fultz*, 232 B.R. 709, 717-719 (Bankr. N.D. Ill. 1999). The Seventh Circuit has interpreted the term "written instrument" as used in Rule 10(c) to include documents such as contracts and loan documentation. *N. Ind. Gun & Outdoor Show, Inc. v. City of S. Bend*, 163 F.3d 449, 453 (7th Cir. 1998). From this rule, the Seventh Circuit has concluded that "'documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.'" *188 LLC v. Trinity Indus., Inc.,* 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Wright v. Assoc. Ins. Cos.,* 29 F.3d 1244, 1248 (7th Cir. 1994)); see *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.,* 417 F.3d 727, 731 n. 3 (7th Cir. 2005) ("'[T]his rule includes a limited class of attachments to Rule 12(b)(6) motions' that are 'central to the plaintiff's claim.'") (quoting *Rosenblum,* 299 F.3d at 661).

Here, the Rally Defendants attach (1) the Trust Agreement and Assignment for the Benefit of Creditors between Argus and Zec, (2) the Agreement and Bill of Sale between Zec (as trustee-assignee for the benefit of creditors of Argus Industries, Inc.) and Hartford, and (3) the Collection Agreement between Zec (as trustee-assignee for the benefit of creditors of Argus Industries, Inc.) and Hartford to their motion to dismiss.[3] The assignment documents are central to the claims in this case and referenced throughout the operative complaint. Furthermore, Third-Party Plaintiffs have not raised a factual dispute as to the assignment documents. Thus, the Court may look at the assignment documents without converting the Rally Defendant's

---

[3] The Court refers to these documents as the "assignment documents."

motion to dismiss into a motion for summary judgment. See also *McCready v. eBay, Inc.*, 453 F.3d 882, 892 (7th Cir. 2006).

## III. Analysis

Third-Party Plaintiffs Pearson and Argus allege that the Rally Defendants breached their fiduciary duties by (a) failing to independently investigate the Hartford Defendants' claims regarding inventory and receivables; (b) terminating the Hartford Collection Agreement; (c) compromising the Office Max lawsuit; (d) failing to demand an accounting from Hartford; (e) failing to make adequate disclosures of the assignment process; and (f) being involved in an allegedly sham sale. To state a claim for breach of fiduciary duty in Illinois, a plaintiff must set forth allegations, supported by facts, that a fiduciary relationship existed between the parties, that the trustee owed certain, specific duties to the plaintiff, that the trustee breached those duties, and that there were resulting damages. See *McCormick v. McCormick*, 455 N.E.2d 103, 110 (Ill. 1983); *Chicago City Bank and Trust Co. v. Lesman*, 542 N.E.2d 824, 826 (Ill. App. Ct. 1st Dist. 1989); see also *Neade v. Portes,* 739 N.E.2d 496 (2000); *Timothy & Thomas LLC v. Viral Genetics, Inc.*, 2010 WL 3155972, at *21 (N.D. Ill. Aug. 10, 2010).

The Rally Defendants first argue that neither Samuels nor Rally Capital are proper defendants. In support of this contention, they claim that the assignment was made to James Zec individually and not on behalf of Rally Capital Services. However, the fifth line of the first paragraph of the assignment refers to "James Zec of Rally Capital Services, LLC." Furthermore, the complaint alleges that Pearson was introduced "to Rally Capital Services LLC and its agents and principals, James Zec and Howard Samuels" and that "Rally was presented as an experienced trustee for the reorganization of distressed businesses." *Id*. at ¶ 22. The complaint is replete with references to the conduct and statements of both Zec and Samuels, acting on

12

behalf of Rally. Finally, the assignment contemplated that Zec could employ "* * * such additional personnel as may be necessary to complete the administration of the Trust." At this stage of the case, Third-Party Plaintiffs have sufficiently alleged the involvement of both Samuels and Rally Capital Services in the underlying events.

The Rally Defendants next argue that Third-Party Plaintiffs' breach of fiduciary duty claim is subject to Rule 9(b)'s heightened pleading standard because this claim is based upon underlying fraudulent conduct. The law in this Circuit is well-settled that the applicability of Rule 9(b)'s heightened pleading standard turns not on the title of the claim but on the underlying facts alleged in the complaint. *Borsellino,* 477 F.3d at 507. Where a claim, whatever its title, "sounds in fraud" (meaning that it is premised upon a course of fraudulent conduct), Rule 9(b) may be implicated. *Id.* To the extent that the allegations are based on allegedly fraudulent conduct, Defendants' point is well taken. Clearly, the assignment did not turn out as Pearson and Argus expected because less money was realized from the sale of the assets. However, the allegations in the complaint demonstrate that Argus was facing either a bankruptcy or an assignment, and Pearson chose an assignment. Third-Party Plaintiffs persist in their claim that the auction sale process was a sham, notwithstanding the presence of Pearson, his advisors, and the primary secured lenders (Chase and Sequel). Calling the sale a sham is in essence calling it a fraud, which triggers the fraud pleading requirements.[4] Yet Third-Party Plaintiffs maintain that

---

[4] For instance, in paragraph 29 of the complaint, Third-Party Plaintiffs allege that sometime during May and June of 2003, "Rally, Hartford, and Graffia all stated the following to Pearson, Ruian, and Sequel: (a) [t]hat Hartford had purchased the company for more than $2.5 million, along with operating capital to continue Argus' operations; (b) [t]hat the purchase price would be sufficient to pay all outstanding secured debt [and] [t]hat this would have the effect of satisfying the guarantee; (c) [t]hat Hartford would continue to bid increasing amounts against all bidders in order to secure ownership of Argus, such that other bidders appearing at the auction would be futile; [and] (d) [t]hat Hartford would continue to operate Argus." These allegations with respect to Rally, which purport to support Third-Party Plaintiffs' position that Rally either orchestrated or facilitated a sham auction, are not plead with particularity. Rally is not an individual capable of making a statement, and Third-Party Plaintiffs have failed to allege that Zec or

13

they do not have a fraud claim against the Rally Defendants and do not even address the fraud standard or attempt to argue that their pleading meets the specificity required for a fraud claim. Instead, Third-Party Plaintiffs insist that they are proceeding on a simple breach of fiduciary claim.

Third-Party Plaintiffs have failed to meet the specificity required for a fraud claim or for a claim sounding in fraud. Therefore, to the extent that Third-Party Plaintiffs allege that the Rally Defendants conspired or colluded with the Hartford Defendants and Chase to conduct a sham auction, or made material misrepresentations about the advantages or disadvantages of the chosen course of conduct in order to facilitate a sham auction, Third-Party Plaintiffs have failed to allege that conduct with specificity and therefore cannot maintain a claim based on that conduct. However, as correctly noted by Third-Party Plaintiffs, "fraud and scienter are not necessary elements of breach of fiduciary duty claims." See *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1088 (N.D. Ill. 2004). Therefore, if the complaint makes allegations that do not sound in fraud, but that state a claim for breach of fiduciary duties, then the claim will survive.

With respect to the breach of fiduciary duty claim, Third-Party Plaintiffs allege that, by virtue of Zec's and Samuel's capacity as assignee/trustee of the Argus Trust, they had fiduciary duties of fidelity, honesty, and the highest duty of care to creditors of Argus (including Pearson). Compl. at ¶ 52. It is clear under Illinois law that "a trustee owes a fiduciary duty to a trust's beneficiaries and is obligated to carry out the trust according to its terms and to act with the highest degrees of fidelity and utmost good faith." *Fuller Family Holdings, LLC v. Northern*

---

Samuels made these statements on a particular date or at a particular place. As noted above, Rule 9(b) is designed "to force a plaintiff to do more than the usual investigation before filing his complaint." *Ackerman,* 172 F.3d at 469. Third-Party Plaintiffs have been given ample time to investigate the allegations in what is now their fifth complaint, and their failure to cure these obvious defects belies any claim that the Rally Defendants can be held liable for orchestrating or facilitating a sham auction.

*Trust Co.,* 863 N.E.2d 743, 754-55 (2007); see also *Bank of America, N.A. v. Carpenter*, 929 N.E.2d 570, 582 (Ill. App. Ct. 1st Dist. 2010); *Janowiak v. Tiesi*, 932 N.E.2d 569, 579-80 (Ill. App. Ct. 1st Dist. 2010) (under the Fiduciary Obligations Act, 760 ILCS 65/1(1), a "fiduciary" includes a trustee under any trust). "The fiduciary obligation of loyalty flows not from the trust instrument but from the relationship of trustee and beneficiary, and the essence of this relationship is that the trustee is charged with equitable duties toward the beneficiary." *Fuller Family Holdings,* 863 N.E.2d at 754-55. Therefore, the Court concludes that Zec (on behalf of Rally) and Samuels owed a duty to Pearson and Argus.

Third-Party Plaintiffs next claim that the Rally Defendants breached their fiduciary duties by failing to independently investigate the Hartford Defendants' claims regarding inventory and receivables; terminating the Hartford Collection Agreement; compromising the Office Max lawsuit; failing to demand an accounting from Hartford; failing to make adequate disclosures of the assignment process; and being involved in an allegedly sham sale. Third-Party Plaintiffs contend that, at a minimum, discovery and factual development is needed to flesh out these issues.

In cases in which breach of fiduciary claims have survived motions to dismiss, the complaints have contained more than bare assertions that defendants breached their duties. Compare *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1099 (N.D. Ill. 2004) (denying motion to dismiss where plaintiffs alleged that director defendants had affirmative duty to monitor and failed to do so) with *Neil v. Zell*, 677 F. Supp. 2d 1010, 1024 (N.D. Ill. 2009) (finding that plaintiffs failed to allege sufficient facts to support their claim for breach of the duty to monitor). In other words, plaintiffs must plead some non-speculative factual allegations about how defendants breached their duties.

The complaint shows that, prior to the assignment, Argus had created a relationship with Hartford which was an existing condition with which the Rally Defendants (as assignee/trustee) had to deal. Compl. at ¶¶ 9-21. The secured lenders, Chase and Sequel, were not funding all of Argus's operations, and Argus would have been shut down but for Hartford's funding. Compl. at ¶¶ 13, 15 and 20. As a result, the Rally Defendants had a limited window to sell the business as a going concern and receive a higher price, rather than simply disposing of the inventory, collecting the receivables, and receiving a lower liquidation price. The complaint and the assignment documents demonstrate that the trustee described the auction and sale process to Pearson and his advisors and that Pearson assented to this process. There are no allegations, beyond the fraud-type allegations (which have not been plead with the requisite particularity), that the Rally Defendants withheld pertinent information or failed to make the appropriate disclosures. Furthermore, there are no allegations that the trustee failed to appropriately notice the sale. Prior to the auction, Zec gave notice to all creditors of the assignment and then gave multi-week public notice of the sale of trust estate assets. Hartford had made an initial offer, which acted as the base bid, and no other offers were submitted. When no bidders showed up at the auction and the Hartford Defendants reneged on their initial offer, the trustee, using the information presented to him, structured another deal with Hartford, which all parties, including Third-Party Plaintiffs (and their attorney and advisor) and Sequel (and its attorney), unanimously approved on the record. None of these allegations demonstrate a breach of fiduciary duties by the Rally Defendants.

Putting aside (i) allegations that the Rally Defendants were colluding with the Hartford Defendants to conduct a sham sale – again, allegations which are not plead with the requisite particularity – and (ii) allegations with respect to the actual auction process – which fail to state a

claim for breach of fiduciary duty even under the liberal Rule 8 standard – Third-Party Plaintiffs have put forth some factual allegations that the Rally Defendants may have breached their post-sale duties under the trust agreement. The complaint alleges that, post-sale, the Rally Defendants breached their fiduciary duties by failing to independently determine the Hartford Defendants' claims regarding inventory and receivables, by failing to demand an accounting from the Hartford Defendants in the face of the Hartford Defendants' failure to satisfy its obligations under the Collection Agreement, by terminating the Collection Agreement with the Hartford Defendants, and by compromising the Office Max lawsuit. The complaint alleges that the Hartford Defendants "failed and refused to account" to the creditors as to Argus's receivables and inventory, and yet Zec and Samuels agreed to terminate Hartford's obligations to pay a continuing percentage of Argus's revenue for the benefit of these creditors. The failure to investigate the Hartford Defendants' refusal to account for Argus's assets and the alleged "overreporting" might not constitute a breach of fiduciary duty by a trustee, but at this stage, on the basis of the pleadings and related documents alone, the Court cannot definitely state that it does not. Furthermore, more factual development is needed into Third-Party Plaintiffs' allegations that the Rally Defendants compromised the Office Max lawsuit.

While a breach of fiduciary claim on these allegations ultimately may not have much traction, given the applicable pleading standards, the Court cannot dismiss the claim without factual development of the duties and the post-sale conduct of the trustee. Whether the trustee used his best judgment, as required under the Trust Agreement, with respect to the post-sale allegations of misconduct cannot be resolved at this stage of the case. Therefore, the Court denies the Rally Defendants' motion to dismiss. However, the Court reiterates that the allegations of a sham auction or misconduct by the Rally Defendants prior to the actual sale on

17

July 15 fail to state a claim for breach of fiduciary duty (or fraud) and that only the allegations of post-sale conduct are sufficient to state a claim for breach of fiduciary duty.

**IV.  Conclusion**

For the reasons stated above, the Rally Defendants' motion to dismiss [65] is denied.

Dated:  September 30, 2010

_____
Robert M. Dow, Jr.
United States District Judge