**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SEQUEL CAPITAL, LLC, | ) | |
|       Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 07-CV-2642 |
| | ) | |
| WILLIAM PEARSON, ANTHONY | ) | District Judge Robert M. Dow, Jr. |
| GRAFFIA, SR., and ANTHONY GRAFFIA, JR., | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |
| | ) | |
| WILLIAM PEARSON and ARGUS | ) | |
| INDUSTRIES, INC., | ) | |
|       Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HARTFORD COMPUTER CORP., ET AL., | ) | |
|       Third-Party Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Third-Party Defendants Hartford Computer Group, Inc. ("Hartford"), Anthony Graffia, Jr., Anthony Graffia, Sr., and Impero Electronics, Inc. (collectively referred to as the "Hartford Defendants") move for judgment on the pleadings [75] as to Counts II through VII of the operative complaint. For the following reasons, the Court grants in part and denies in part the Hartford Defendants' motion.

**I.  Background**

**A.  Procedural History**

On September 22, 2009, the Hartford Defendants filed their motion for judgment on the pleadings [75]. On November 16, 2009, Third-Party Plaintiffs William Pearson and Argus Industries, Inc. filed their response to the Hartford Defendants' motion for judgment on the pleadings, and on December 4, the Hartford Defendants filed their reply. Then, on February 3,

2010, Third-Party Plaintiffs filed a motion for leave to file a fourth amended complaint [105], which the Court granted. The Court gave the Hartford Defendants additional time to modify their previously filed motion for judgment on the pleadings to fit the allegations in the fourth amended complaint ("complaint"). The Hartford Defendants subsequently filed an additional brief [118], Third-Party Plaintiffs filed a reply [120-2] to the additional arguments, and the Hartford Defendants filed a surreply [125].

The newest complaint alleges six causes of action against the Hartford Defendants – the four counts alleged in the Third Amended Complaint (Tortious Interference with Contract, Fraud, and two counts of Fraudulent Transfer) plus two new counts for Tortious Inducement of Breach of Fiduciary Duty (Count II) and Contribution/Offset (Count VII).[1] The Hartford Defendants moved for judgment on the pleadings as to all Counts (II, III, IV, V, VI, and VII) asserted against them.

### B.    Factual Background[2]

Third-Party Plaintiff Argus Industries, Inc. ("Argus") manufactured, imported, and distributed digital cameras for sale to retailers, including Wal-Mart and Office Max. Third-Party Plaintiff Bill Pearson ("Pearson") was the president and sole owner of Argus. Argus' business model, like that of many importers, relied on international letters of credit to drive its business. The letters of credit typically were secured by goods purchased from the overseas manufacturer through a purchase order. Upon receipt of a letter of credit, the overseas manufacturer would

---

[1] The complaint also alleges a breach of fiduciary duty (Count I) by Third-Party Defendants Rally Capital Services, LLC ("Rally") and Howard Samuels (collectively referred to as the "Rally Defendants"). The Rally Defendants filed a motion to dismiss Count I, which the Court denied in a separate opinion issued on September 30, 2010.

[2] The relevant facts are derived from Third-Party Plaintiffs' Fourth Amended Complaint (referred to as "the complaint") because, on a motion for judgment on the pleadings, the Court accepts as true the well-pleaded factual allegations in the complaint. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006).

ship cameras to Argus, or would "drop-ship" Argus-brand cameras directly to the retailers. The retailers then would pay Argus by depositing funds in a drop-box at the lender's bank.

In April 2002, Sequel Capital, LLC ("Sequel") agreed to lend $2,000,000 to Argus. In November 2002, Sequel agreed to lend Argus an additional $1,000,000, bringing Argus's total debt to $3,000,000. Sequel's loan was secured by a security interest in a designated portion of Argus's inventory (cameras). Argus also borrowed approximately $1.3 million from J.P. Morgan Chase & Co. ("Chase") to support its international business operations. However, Chase and Sequel agreed that Sequel had a priority position over Chase with respect to Argus's camera inventory.

In November 2002, Office Max cancelled an order, leaving Argus with approximately $1.5 million worth of goods "in transit," and also withheld payments allegedly due, causing Argus to default on its loans with Chase and Sequel. Following the Office Max cancellation, Chase elected to seek immediate repayment from Argus on the letter of credit and its other advances to Argus. According to the complaint, at the time that Chase elected to seek immediate repayment from Argus, Argus was operating profitably but did not have the liquid funds to pay Chase upon demand. In May 2003, a representative of Chase introduced William Pearson, Argus's President and CEO, to Anthony Graffia, Sr. and Anthony Graffia, Jr. According to the complaint, Graffia Jr. informed Pearson that Graffia Jr.'s company, Defendant Hartford Computer Group, Inc., had more than enough liquid capital on hand to float Argus's need for capital for immediate inventory, satisfy the Chase and Sequel credit facilities, and provide working capital for Argus's continued operations. Fourth Amended Complaint ("Compl.") at ¶ 15.

Through Chase and the Hartford Defendants, Pearson was introduced to Rally Capital and its principals, James Zec[3] and Howard Samuels. Rally was presented as an experienced trustee for the reorganization of distressed businesses. Compl. at ¶ 22. Once these introductions were made, the discussions evolved from turning around the Argus operation into creating a prepackaged assignment for the benefit of creditors in which the Hartford Defendants would acquire the assets of Argus and then Rally would use the proceeds to pay Argus's creditors in full. According to the complaint, the Rally Defendants "had a longstanding approach to assignments that benefited them and worked to the detriment of both assignors and outside creditors." *Id*. at ¶ 24. The complaint alleges that "Samuels and Zec [ ] told Pearson in mid-June 2003 that they had a fail-safe method for conducting assignments virtually guaranteed to result in full payment of creditors and a surplus to the assignor." *Id*. The complaint further alleges that Samuels and Zec described the method to Pearson, which involved selling the assigned company to a buyer for a set sum and allowing the buyer to begin operating the assigned entity, then offering the assets at auction to determine whether the assets at issue would sell for more than the agreed-upon price. *Id*. According to the complaint, Samuels and Zec told Pearson that if no bids higher than the agreed price were received, the assets would remain with the original buyer. *Id*. Third-Party Plaintiffs allege that "Samuels and Zec had a duty to disclose that this method, first selling the company to a buyer for a firm price, letting the buyer operate the company, and then setting up an 'auction'[,] was guaranteed to fail." *Id*. at ¶ 25.

On June 17, 2003, Pearson (on behalf of Argus) executed a Trust Agreement and Assignment for the Benefit of Creditors with James Zec, of Rally Capital Services LLC, who was to serve as assignee/trustee. The agreement indicated that Argus was indebted to various

---

[3] James Zec was a principal of Rally until his death. In the complaint, Third-Party Plaintiffs indicate that they have dismissed him as an individual defendant due to the insolvency of his probate estate.

entities, unable to pay its debts, had decided to discontinue its business, and desired "to transfer its property to an assignee for the benefit of its creditors so that the property so transferred [would be] expeditiously liquidated and the proceeds therefrom fairly distributed to its creditors without any preference or priority, except such priority as established and permitted by applicable law." Rally Def. Ex. A-1. Then on June 27, 2003, Zec, in his capacity as trustee/assignee, entered into an Agreement and Bill of Sale with Hartford for the sale of Argus's assets to Hartford for $2.5 million as well as a collection agreement in which Hartford would collect Argus's existing receivables and earn a thirty percent fee in return. Both Sequel and Chase had options not to release their security interests. Zec advertised the sale to the general public and sent the notices of the assignment and sale to all known Argus creditors on June 26, 2003.

According to the complaint, two companies, Sequel (an Argus creditor) and Ruian (an Argus supplier), submitted term sheets and told the Rally Defendants that they were willing to pay significant sums upfront and provide substantial debt financing, none of which Hartford was willing to provide. This allegedly was confirmed in a letter to Pearson from John Iwanski, Sequel's Chief Financial Officer, on June 4, 2003. Pearson provided the letter to Rally in connection with the assignment, and Rally, through Zec and Samuels, promised to seriously consider Sequel's competing offer for the assets. Ruian submitted a term sheet and said that it would appear and participate in the auction. According to the complaint, either bid would have fully satisfied Argus's debts, both to Sequel and to Chase, and released the guarantee which is the subject of this lawsuit. However, neither Sequel nor Ruian actually submitted bids.

The complaint alleges that during May and June of 2003, "Rally, Hartford, and Graffia all stated the following to Pearson, Ruian, and Sequel: (a) [t]hat Hartford had purchased the

company for more than $2.5 million, along with operating capital to continue Argus' operations; (b) [t]hat the purchase price would be sufficient to pay all outstanding secured debt [and] [t]hat this would have the effect of satisfying the guarantee; (c) [t]hat Hartford would continue to bid increasing amounts against all bidders in order to secure ownership of Argus, such that other bidders appearing at the auction would be futile; [and] (d) [t]hat Hartford would continue to operate Argus." *Id*. at ¶ 29. According to Third-Party Plaintiffs, these representations were repeated by Zec and the Graffias "often," both in person and by telephone, from June 17, 2003 through July 2, 2003. *Id*. at ¶ 30. According to the complaint, on at least two occasions, on or about June 17 and June 20, 2003, one of the Graffias told Pearson that there were no obstacles to completing the deal. This was echoed by Zec, "who told Pearson that a buyer with possession of the assets was in a far better position than one that would be moving in after Hartford had owned and operated the company for a month, emphasizing how disruptive a second transition would be." *Id*. at ¶ 31. The complaint alleges that the purpose behind these statements was to foreclose bidding and assure that Hartford would be able to keep Argus's assets.

According to the allegations, Pearson relied on these statements and did not oppose the Hartford sale or undertake extraordinary efforts to assure that bidders would appear for the auction. In further reliance on these statements, Pearson also told Ruian and Sequel that he would be inclined to accept employment with Hartford and not the competing bidders. On July 11, 2003, the date of the "auction," at the posted time for the auction, no bidders appeared and no competing offers were made. *Id*. at ¶ 33. The complaint alleges that Sequel and Ruian later told Pearson that they had not submitted bids because the Graffias and Zec had told them Hartford was prepared to outbid them at any price. *Id*.

The complaint alleges that Hartford was not prepared to outbid the other potential investors, but conspired with the Graffias and Zec to assure that Hartford would be the only buyer at dramatically reduced prices. Days before the scheduled date of sale, Anthony Graffia, Sr. announced that Hartford's due diligence had turned up irregularities in inventory and receivables and thus Hartford was withdrawing from the asset purchase agreement. The complaint alleges that this fact was not made known to anyone other than Rally until the date of the auction. Following the auction (at which no bidders appeared), the complaint alleges that Zec and the Graffias entered into "closed-door" negotiations. Compl. at ¶ 35. Then, on July 15, 2003, Hartford purchased Argus's assets from the trustee for $1.3 million. All parties present at the auction, including Third-Party Plaintiffs, the trustee, and the secured creditors, assented to the sale. The trustee then tendered $1.3 million to Chase, fully satisfying Argus's outstanding loan from Chase. In order to close the sale, Anthony Graffia, Sr. told Sequel that there were sufficient assets, inventory, and receivables remaining in the Argus estate such that continued operations would provide a revenue stream from which Sequel's secured note would be satisfied. *Id*. at ¶ 36. Sequel agreed to a continuing payment from the ongoing Argus operation of 30% of its net revenue until the note was satisfied. *Id*. Hartford also entered into an agreement with Rally to pay a certain portion of Argus's revenue stream to the trustee until other creditors' claims were fully paid. *Id*.

The complaint alleges that, "[o]n information and belief," the Graffias and Hartford had no intention to pay any revenue from the Argus operation to Sequel or any other secured lender. Compl. at ¶ 37. Instead, the Graffias and Hartford intended to strip the Argus assets at the first opportunity and leave the secured lenders and Pearson without any recourse. *Id*. After the closing, in September 2003, Anthony Graffia (the complaint does not specify whether it was Sr.

7

or Jr.) told Pearson and Sequel that Hartford had discovered that the Argus receivables and inventory were misreported. *Id*. at ¶ 38. The complaint alleges that the overstatements resulted from the Graffias not allowing returns to be shown as inventory. According to the complaint, "all of the pre-assignment receivables remained valid, including a receivable represented by the lawsuit against OfficeMax," and Hartford was required to pay Sequel and the trustee (on behalf of Argus's creditors) 70% of the receipts on pre-assignment receivables. *Id*. at ¶ 40. The complaint alleges that Pearson discovered that, instead of collecting and remitting on these receivables, Hartford instead was discounting and forgiving such receivables, without notice to Sequel, the trustee, or Argus's other creditors, in return for customers' orders of non-Argus product from other Hartford subsidiaries. For example, the complaint alleges "on information and belief" that a significant receivable to CompUSA was wiped off the books in return for substantial purchases of VisionTek computer graphics cards. *Id*. Instead of showing the write-off as a debt of VisionTek to Argus, Hartford, through the Graffias, simply showed the receivable as "uncollectable." The complaint further alleges that the Graffias convinced Sequel to forgo its right to participate in Argus revenue by submitting a doctored accounting to support their position and that the Graffias misrepresented the receivables and inventory to Sequel in order to retain all of the revenue generated by the Argus assets. Argus and Pearson allege that due to Hartford's misrepresentations, Sequel demanded payment from Pearson on his guarantee and filed the instant action.

The complaint alleges that some time after the sale to Hartford, Zec died and Rally named Samuels as successor trustee. In November 2003 and April 2004, Rally agreed to terminate Hartford's obligation to pay a continuing percentage of Argus's revenue for the benefit of Argus's remaining creditors. The stated basis was the supposed "overreporting" of the Argus

inventory and receivables. *Id.* at ¶ 43. The complaint further alleges, "[o]n information and belief," that the trustee did not demand an accounting to demonstrate that the Argus inventory and receivables were overreported but rather took at face value Hartford's assurances that the inventory and receivables were short and did not independently investigate the Graffias' representations. *Id.* at ¶ 44.

## II.    Legal Standard

The Hartford Defendants have moved for judgment on the pleadings pursuant to Rule 12(c). A Rule 12(c) motion for judgment on the pleadings permits a party to move for judgment after both the plaintiff's complaint and the defendant's answer have been filed. Fed. R. Civ. P. 12(c); *Brunt v. Serv. Employees Int'l Union,* 284 F.3d 715, 718 (7th Cir. 2002). A court should grant a Rule 12(c) motion only when it appears beyond a doubt that the plaintiff cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved. *Id.* at 718-719. Rule 12(c) motions are reviewed under the same standard as Rule 12(b)(6) motions to dismiss. *Piscotta v. Old Nat'l Bancorp,* 499 F.3d 629, 633 (7th Cir. 2007).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. See *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief

above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Svcs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 569 n. 14). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 546. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citations, quotation marks, and brackets omitted). Again, in deciding this motion, the Court accepts as true all of the well-pleaded facts alleged by the plaintiff and all reasonable inferences that can be drawn therefrom. *Thomas*, 381 F.3d at 704.

Where a complaint sounds in fraud, the allegations of fraud must satisfy the heightened pleading requirements of Rule 9(b). Fed. R. Civ. P. 9(b); see also *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). Rule 9(b) of the Federal Rules of Civil Procedure creates exceptions to the federal regime of notice pleading and specifies that, for "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The rule is designed "to force a plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). To that end, the "circumstances" of fraud that a plaintiff must include in her complaint are "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Svcs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008) (quoting *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1075 (7th Cir. 1997)); *Midwest Commerce Banking Co. v.*

*Elkhart City Centre*, 4 F.3d 521, 523-24 (7th Cir. 1993); see also *Borsellino,* 477 F.3d at 507 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990) (noting that the complaint must allege the "the who, what, when, where, and how:  the first paragraph of a newspaper story.").  "Read together, Rule 9(b) and Rule 8 require that the complaint include the time, place and contents of the alleged fraud, but the complainant need not plead evidence."  *Amakua Development LLC v. Warner*, 411 F. Supp. 2d 941, 947 (N.D. Ill. 2006) (citing *Nissan Motor Acceptance Corp. v. Schaumburg Nissan, Inc.*, 1993 WL 360426, at *3 (N.D. Ill. Sept. 15, 1993)).  A fraud claim cannot be based on "information and belief" unless the plaintiff "states the grounds for his suspicions."  *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992).

In considering a motion to dismiss or for judgment on the pleadings, courts should consider the "pleadings," which include the complaint, answer, and any written instruments attached as exhibits.  *In re Fultz*, 232 B.R. 709, 717-719 (Bankr. N.D. Ill. 1999).  The Seventh Circuit has interpreted the term "written instrument" as used in Rule 10(c) to include documents such as contracts and loan documentation.  *N. Ind. Gun & Outdoor Show, Inc. v. City of S. Bend*, 163 F.3d 449, 453 (7th Cir. 1998). From this rule, the Seventh Circuit has concluded that "'documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.'"  *188 LLC v. Trinity Indus., Inc.,* 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Wright v. Assoc. Ins. Cos.,* 29 F.3d 1244, 1248 (7th Cir. 1994)); see *Cont'l Cas. Co. v. Am. Nat'l Ins. Co.,* 417 F.3d 727, 731 n. 3 (7th Cir. 2005) ("'[T]his rule includes a limited class of attachments to Rule 12(b)(6) motions' that are 'central to the plaintiff's claim.'") (quoting *Rosenblum,* 299 F.3d at 661).

Here, the Hartford Defendants rely on (1) the Trust Agreement and Assignment for the

Benefit of Creditors between Argus and Zec, (2) the Agreement and Bill of Sale between Zec (as trustee-assignee for the benefit of creditors of Argus Industries, Inc.) and Hartford, and (3) the Collection Agreement between Zec (as trustee-assignee for the benefit of creditors of Argus Industries, Inc.) and Hartford to their motion to dismiss.[4] The assignment documents are central to the claims in this case and referenced throughout the fourth amended complaint. Furthermore, Third-Party Plaintiffs have not raised a factual dispute as to the assignment documents. Thus, the Court may look at the assignment documents without converting the Hartford Defendant's motion for judgment on the pleadings into a motion for summary judgment. See also *McCready v. eBay, Inc.*, 453 F.3d 882, 892 (7th Cir. 2006).

### III.    Analysis

Third-Party Plaintiffs' fourth amended complaint alleges six causes of action against the Hartford Defendants: Inducement of Breach of Fiduciary Duty (Count II); Tortious Interference with Contract (Count III), Fraud (Count IV), Fraudulent Transfer pursuant to 740 ILCS 160/5(a)(1) (Count V), Fraudulent Transfer pursuant to 740 ILCS 160/5(a)(2) (Count VI); and Contribution/Offset (Count VII). The Hartford Defendants have filed a motion for judgment on the pleadings as to all counts asserted against them. The Court will address each count in turn.

### A.    Tortious Inducement of Breach of Fiduciary Duty

In Count II, Plaintiffs allege that the Hartford Defendants "colluded" with the Rally Defendants and induced their breach of fiduciary duty. The complaint goes on to allege that the Hartford Defendants "engaged in an elaborate shell-game known to the Trustee or assented to by the Trustee." Third-Party Plaintiffs claim that the "conduct of * * * Defendants both pre and post sale * * * constitutes a breach of duties owed to Pearson and Argus." Under Illinois law, a

---

[4] The Court refers to these documents as the "assignment documents."

party is liable for tortious inducement if a plaintiff demonstrates that the defendant (1) colluded with a fiduciary in committing a breach; (2) knowingly participated in or induced the breach of duty; and (3) knowingly accepted the benefits resulting from that breach. See *Regnery v. Meyers,* 679 N.E.2d 74, 80 (Ill. App. Ct. 1st Dist. 1997); *Village of Wheeling v. Stavros*, 411 N.E.2d 1067, 1070 (Ill. App. Ct. 1st Dist. 1980) ("A third party's inducement of, or knowing participation in[,] a breach of duty by an agent is a wrong against the principal which may subject the third party to liability"); see also *Borsellino*, 477 F.3d at 509.

The Hartford Defendants argue that Third-Party Plaintiffs' inducement of breach of fiduciary duty claim is subject to Rule 9(b)'s heightened pleading standard because this claim is based upon underlying fraudulent conduct. The law in this Circuit is well-settled that the applicability of Rule 9(b)'s heightened pleading standard turns not on the title of the claim but on the underlying facts alleged in the complaint. *Borsellino,* 477 F.3d at 507. Where a claim, whatever its title, "sounds in fraud" (meaning that it is premised upon a course of fraudulent conduct), Rule 9(b) may be implicated. *Id.* To the extent that the allegations are based on allegedly fraudulent conduct, Defendants' point is well taken, and Third-Party Plaintiffs tacitly concede this point by failing to respond to the argument (set forth in each of the Hartford Defendants' briefs) that the Rule 9(b) standard applies.

The assignment clearly did not turn out as Pearson and Argus expected because less money was realized from the sale of the assets. However, the allegations in the complaint demonstrate that Argus was facing either a bankruptcy or an assignment, and Pearson chose an assignment. Third-Party Plaintiffs persist in their claim that the auction sale process was a sham, notwithstanding the presence of Pearson, his advisors, and the primary secured lenders (Chase and Sequel). Calling the sale a sham is in essence calling it a fraud, which triggers the fraud

pleading requirements.[5] Thus, Third-Party Plaintiffs' claim, at least pre-sale, is subject to Rule 9(b)'s heightened pleading standard, and Third-Party Plaintiffs have failed to meet the specificity required for a claim sounding in fraud. Therefore, to the extent that Third-Party Plaintiffs allege that the Hartford Defendants conspired or colluded with the Rally Defendants to conduct a sham auction, or made material misrepresentations to potential bidders in order to facilitate a sham auction, Third-Party Plaintiffs have failed to allege that conduct with specificity and therefore cannot maintain a claim based on that conduct.

However, "fraud and scienter are not necessary elements of breach of fiduciary duty claims." See *Howell v. Motorola, Inc.*, 337 F. Supp. 2d 1079, 1088 (N.D. Ill. 2004). By analogy, fraud is not a necessary element for a claim of inducement of breach of fiduciary duty. Therefore, if the complaint makes allegations that do not sound in fraud, but that state a claim for inducement of breach of fiduciary duties, then the claim will survive.

The Court already has determined that Third-Party Plaintiffs have stated a breach of fiduciary claim concerning whether the trustee used his best judgment, as required under the Trust Agreement, with respect to the post-sale allegations of misconduct. The Court found that

---

[5] For instance, in paragraph 29 of the complaint, Third-Party Plaintiffs allege that sometime during May and June of 2003, "Rally, Hartford, and Graffia all stated the following to Pearson, Ruian, and Sequel: (a) [t]hat Hartford had purchased the company for more than $2.5 million, along with operating capital to continue Argus' operations; (b) [t]hat the purchase price would be sufficient to pay all outstanding secured debt [and] [t]hat this would have the effect of satisfying the guarantee; (c) [t]hat Hartford would continue to bid increasing amounts against all bidders in order to secure ownership of Argus, such that other bidders appearing at the auction would be futile; [and] (d) [t]hat Hartford would continue to operate Argus." These allegations with respect to the Hartford Defendants, which purport to support Third-Party Plaintiffs' position that the Hartford Defendants either orchestrated or facilitated a sham auction, are not pled with particularity. Hartford is not an individual capable of making a statement, and the complaint fails to allege which Graffia made the statement. Furthermore, Third-Party Plaintiffs have failed to allege that these statements were made on a particular date or at a particular place. As noted above, Rule 9(b) is designed "to force a plaintiff to do more than the usual investigation before filing his complaint." *Ackerman,* 172 F.3d at 469. Third-Party Plaintiffs have been given ample time to investigate the allegations in what is now their fifth complaint, and their failure to cure these obvious defects belies any claim that the Hartford Defendants can be held liable for orchestrating or facilitating a sham auction.

Third-Party Plaintiffs sufficiently pled that the Rally Defendants breached their fiduciary duties by failing to independently determine the Hartford Defendants' claims regarding inventory and receivables, by failing to demand an accounting from the Hartford Defendants in the face of the Hartford Defendants' failure to satisfy its obligations under the Collection Agreement, by terminating the Collection Agreement with the Hartford Defendants, and by compromising the Office Max lawsuit. Putting aside allegations that the Rally Defendants were colluding with the Hartford Defendants to conduct a sham sale – again, allegations which are not pled with the requisite particularity – Third-Party Plaintiffs have set forth factual allegations that the Hartford Defendants knowingly participated in or induced the alleged breach of duty by the Rally Defendants and then knowingly accepted the benefits resulting from that breach.

The complaint alleges that, in order to close the sale, Anthony Graffia, Sr. told Sequel that there were sufficient assets, inventory, and receivables remaining in the Argus estate such that continued operations would provide a revenue stream from which Sequel's secured note would be satisfied. Hartford then entered into an agreement with Rally to pay a certain portion of the Argus's revenue stream to the trustee until other creditors' claims were fully paid. The complaint alleges that the Graffias and Hartford failed to pay that revenue to Sequel and had no intention of doing so. Furthermore, in September 2003, one of the Graffias told Pearson and Sequel that Hartford had discovered that the Argus receivables and inventory were misreported; Third-Party Plaintiffs allege that the overstatements were not the result of misreporting but rather the result of the Graffias not allowing returns to be shown as inventory. The complaint further alleges that Pearson discovered that, instead of collecting and remitting on these receivables, Hartford instead was discounting and forgiving such receivables. Third-Party Plaintiffs also contend that the Graffias convinced Sequel to forgo its right to participate in Argus revenue by

submitting a doctored accounting to support their position and that the Graffias misrepresented the receivables and inventory to Sequel in order to retain all of the revenue generated by the Argus assets. Argus and Pearson allege that due to Hartford's misrepresentations, Sequel demanded payment from Pearson on his guarantee and filed the instant action. Finally, in November 2003 and April 2004, Rally agreed to terminate Hartford's obligation to pay a continuing percentage of Argus's revenue for the benefit of Argus's remaining creditors due to Hartford's assurances that Argus had overreported its inventory and receivables.

Under the applicable pleading standards, Third-Party Plaintiffs have adequately stated a claim against the Hartford Defendants for tortious inducement of breach of fiduciary duty. The allegations set forth, if true, support a claim that the Hartford Defendants induced the trustee to breach his fiduciary duties to the creditors and that the Hartford Defendants benefited from the trustee's breach. Therefore, the Court denies the Hartford Defendants' motion for judgment on the pleadings as to Count II.

### B. Tortious Interference with Contract

The elements of tortious interference with contract are: (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existing contract; (3) the defendant's intentional and malicious inducement of the breach; (4) subsequent breach by a third person due to defendant's wrongful conduct; and (5) resulting damage to plaintiff. *Europlast, Ltd. v. Oak Switch Systems, Inc.*, 10 F.3d 1266, 1273-75 (7th Cir. 1993); *Prince v. Zazove,* 959 F.2d 1395, 1397 (7th Cir. 1992); see also *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005). The Restatement (Second) of Torts further explains that the "Intentional Interference with Performance of Contract by Third Person" encompasses the situation in which "[o]ne who intentionally and improperly interferes with the performance of a contract * * * between another

16

and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." Restatement (Second) of Torts § 766 (1979).

Third-Party Plaintiffs contend that the Hartford Defendants "induced, caused, or assisted the Trustee to breach its contract with Argus." At this point, Third-Party Plaintiffs have sufficiently alleged the existence of a contract (the Trust Assignment) and the Hartford Defendants' knowledge of that contract. The complaint also alleges that the Hartford Defendants intentionally induced the trustee to breach the contract by failing to fulfill his obligations under the contract – that is, by inducing him to fail to use his best judgment in carrying out the terms of the contract post-sale. Finally, the complaint alleges that Pearson is a creditor of Argus and that he was damaged by the breach.[6] These allegations – limited to the post-sale conduct of both the Rally and Hartford Defendants – sufficiently state a claim for tortious interference with contract.

---

[6] At this stage, when the Court accepts as true the well-pleaded factual allegations in the complaint, the Hartford Defendants' arguments regarding the Third-Party Plaintiffs' standing are defeated by Third-Party Plaintiffs' allegations that Pearson is a creditor of Argus and that Argus was entitled to the remainder, if any, of the Argus estate after the assignment was wound up. Compl. at ¶ 2. The Hartford Defendants briefly argue that Pearson was not owed a duty under the Assignment and therefore he is not a creditor such that he would be entitled to seek redress against the Hartford Defendants for a breach. If the Hartford Defendants wish to pursue this claim at summary judgment, they must support their position with adequate citations to supporting authority – not merely authority supporting the unchallenged position that property is held in trust for the benefit of creditors, but authority supporting their argument that an individual who makes a personal guaranty on a loan is not a creditor. See, *e.g.*, *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n. 1 (7th Cir. 2004) ("We have repeatedly made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"); *United States v. Amerson*, 185 F.3d 676, 689 (7th Cir. 1999) ("[G]iven our adversarial system of litigation, it is not the role of this Court to research and construct legal arguments open to the parties, especially when they are represented by counsel."). In any event, at this stage, Third-Party Plaintiffs have sufficiently alleged that Pearson is a creditor of Argus and that Argus was entitled to any remainder of the Argus estates at the conclusion of the assignment. Compl. at ¶ 2.

## C. Fraud

Third-Party Plaintiffs contend that both the pre-sale and post-sale conduct of the Hartford Defendants constitutes fraud. For the reasons stated in both the Court's analysis of the claim for tortious inducement of breach of fiduciary duty as well the Court's opinion denying the Rally Defendants' motion to dismiss, the allegations regarding the pre-sale conduct of the Hartford and Rally Defendants do not meet the pleading requirements for fraud claims.

Turning to the post-sale conduct, under Illinois law, the following elements must be included in a claim for fraud: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Tricontinental Ind., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007). As previously set forth, a plaintiff alleging fraud or mistake faces a heightened pleading standard, which requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); see also *DiLeo*, 901 F.2d at 629 (a plaintiff's complaint must include "the who, what, when, where, and how" for fraud claims). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The complaint alleges that following the sale, the Hartford Defendants arranged to make it appear that the Argus assets were significantly overvalued, even though an independent audit had confirmed their value prior to the sale. According to the complaint, the purpose of this arrangement was to cause the remaining creditors, including Sequel and Pearson, to realize no compensation from the Argus estate, and to assure that there would be no excess from the liquidation to be paid back to Argus's creditors. The complaint also alleges that the Graffias

made multiple statements from November 2003 to April 2004 that the Argus inventory and receivables were significantly overvalued and that these representations were untrue, and that as a result of the conduct of the Hartford Defendants, there were no surplus proceeds to be repaid to Argus's creditors. Finally, the complaint alleges that Sequel relied on the Graffias' and the Trustee's statements and sought to enforce Pearson's guarantee of the Sequel credit facility, thereby damaging Pearson and Argus.

The Court finds that the allegations of post-sale fraudulent conduct fail to state a claim for fraud. The primary problem with Third-Party Plaintiff's allegations is that once they entered into the assignment, they no longer had control of the assets. From time of the assignment onward, the trustee controlled the sale and also controlled the facilitation of the collection agreement. Therefore, Third-Party Plaintiffs cannot demonstrate that any statement by the Hartford Defendants was made with the intent to induce Argus and Pearson to act. Furthermore, even if the Court were to assume that the misrepresentations were made with the intent to induce Third-Party Plaintiffs to act, the complaint fails to allege that Third-Party Plaintiffs relied on the truth of any statements that the Hartford Defendants made post-sale. At the point at which the Hartford Defendants are alleged to have made misrepresentations that the Argus inventory and receivables were significantly overvalued or are alleged to have doctored the financial documents to indicate losses when in fact there were surpluses, the only individuals or entities that they could have been seeking to dupe would have been the trustee, who was charged with distributing the assets to Argus's creditors, and Sequel, who had entered into an agreement whereby it would collect a percentage of the receipts on the pre-assignment receivables.[7]

---

[7] According to the allegations in the complaint as well as the relevant assignment documents and the representations in the parties' briefs, Sequel Capital and the Hartford Defendants made an agreement at the time of the sale that involved payments from Hartford to Sequel from Argus's inventory and

Therefore, Third-Party Plaintiffs have failed to state a claim for fraud against the Hartford Defendants, and the Court grants the Hartford Defendants' motion for judgment on the pleadings as to Count IV. [8]

### D.    Fraudulent Transfers pursuant to 740 ILCS 160/5(a)(1) and (a)(2)

Third-Party Plaintiffs seek recovery against the Hartford Defendants under two sections of the Uniform Fraudulent Transfer Act ("UFTA").  Count V alleges a claim under Section 5(a)(1) of the Act and Count VI alleges a claim under Section 5(a)(2).  These sections provide, in relevant part:

> (a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1)    with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (2)    without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (B)    intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

---

receivables designed to pay down the loan made by Sequel to Argus in 2002.  Neither Argus nor Pearson was a party to that agreement, and the agreement was made after the assets of Argus had been assigned to the trustee.

[8]  The Court also has concerns that the allegations with respect to the misstatements lack particularity. The allegations are not specific as to date and time or to the form of communication – for example, Third-Party Plaintiffs allege that "the Graffias" misrepresented the receivables and inventory to Sequel in order to retain all of the revenue generated by Argus assets and that Hartford made "misrepresentations" that induced Sequel to demand repayment for Pearson, but these allegations do not specify the date of the misrepresentation, exactly who made the misrepresentation, or to whom the misrepresentation was made. Therefore, in addition to failing to allege pre-sale fraudulent conduct with the requisite particularity, the allegations in the fourth amended complaint with respect to post-sale fraudulent conduct likely fail to meet heightened standard set forth by Rule 9(b).  However, the Court need not definitively decide whether the post-sale factual allegations satisfy the Rule 9(b) standard because the claim fails for the independent reason set forth above.

740 ILCS 160/5(a)(1) & (a)(2). The Illinois Supreme Court has held that "for a cause of action to exist, the factual situation must include a debtor who is liable on a claim to a creditor." *A.P. Properties, Inc. v. Goshinsky*, 714 N.E.2d 519, 521 (Ill. 1999). Consequently, Third-Party Plaintiffs must allege (i) a "claim" under the Act, and (ii) their status as creditors as defined within the statute. Under the UFTA, a "claim" means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 740 ILCS 160/2(c). A creditor means "a person who has a claim" (740 ILCS 160/2(d)), and a "debtor" means "a person who is liable on a claim" (740 ILCS 160/2(f)). To sustain a claim under the UFTA, "the creditor must show that, at some time, it has 'a right of payment' that it can seek to recover from the debtor. Stated simply, the Act requires a debtor/creditor relationship. That relationship can be contingent or unmatured, but it must exist." *A.P. Properties, Inc.*, 714 N.E.2d at 522. Put another way, to properly plead a claim under the UFTA, the creditor must demonstrate that the debtor owes or potentially owes a "payment" to the creditor. *Id*.

The Hartford Defendants sole argument on the UFTA claims is that Third-Party Plaintiffs have no "claim" against the Hartford Defendants because all the other counts of the fourth amended complaint should be dismissed. As set forth above, Third-Party Plaintiffs have claims that survive the Hartford Defendants' motion for judgment on the pleadings. And as the Hartford Defendants acknowledged in one of their briefs, "[I]f the Third-Party Plaintiffs could demonstrate that they do state claims against the [Hartford Defendants], then they could satisfy the UTFA prerequisite that they have a 'claim' and they might be able to show standing under the UFTA." See Docket Entry 97 at p. 10. Therefore, because the Court has concluded that Third-Party Plaintiffs have stated claims against the Hartford Defendants and because the

Hartford Defendants have failed to offer an alternative reason for dismissing the fraudulent transfer claims, the Court denies the Hartford Defendants' motion for judgment on the pleadings with respect to Counts V and VI.

### D. Contribution/Offset

Raised for the first time in their fourth amended complaint, Third-Party Plaintiffs allege a "Contribution/Offset" claim against Anthony Graffia, Sr. and Anthony Graffia, Jr. The complaint alleges that the Graffias owed Pearson a duty to operate Argus in a manner that satisfied its obligations to Sequel and to the trustee, and that the Graffias violated that duty by manipulating the financial records of Argus in order to make it appear that Argus was unable to compensate Sequel and the trustee as it had agreed. The complaint further alleges that as a proximate result of the Graffias' conduct, Pearson has been sued in this action by Sequel to collect on a personal guarantee that should have been paid either by the Graffias (1) tendering the agreed-upon $2.5 million purchase price or (2) by Hartford's full performance of its obligations under collection agreements with Sequel and the trustee. Therefore, the complaint alleges that the Graffias are liable to Pearson for any sums awarded to Sequel in this action. In the underlying action, Sequel's second amended complaint alleges a breach of guaranty claim against Pearson (Count I), as well as a common law fraud claim (Count II) and two RICO claims (Count III) against the Graffias.

The Illinois Joint Tortfeasors Contribution Act (the "Contribution Act") provides that where two or more people "are subject to liability in tort arising out of the same injury * * * there is a right of contribution among them, even though judgment has not been entered against any or all of them." 740 ILCS 100/2(a). The Act establishes the *right* of contribution, so it applies even where a judgment has not been entered against any of the potential tortfeasors. *Id.*

Illinois law makes clear that "[a]ctions for indemnity and contribution are, by their very nature, contingent claims; each is contingent on the party seeking the relief first having been found liable in tort to the plaintiff in the underlying action." *Patch v. Glover*, 618 N.E.2d 583, 588 (Ill. App. Ct. 1st Dist. 1993). At this point in the litigation, none of Sequel's claims in the underlying suit has been resolved, making it difficult for the Court to assess the viability of Third-Party Plaintiffs' contribution claim. The Graffias' objection to Third-Party Plaintiff's contribution claim may be raised at a later date, after further development of the merits of the underlying case as well as the third-party case, but at this time, the objection is premature. Therefore, the Hartford Defendants motion for judgment on the pleadings as to the contribution claim is denied without prejudice.

## IV. Conclusion

For the reasons stated above, the Court grants in part and denies in part the Hartford Defendants' motion for judgment on the pleadings [75]. The Court grants the motion as to Count IV (fraud), but denies the motion with respect to Counts II-III (Tortious Inducement of Breach of Fiduciary Duty and Tortious Interference with Contract) and Counts V-VII (two counts of Fraudulent Transfer and Contribution/Offset).

Dated:  October 12, 2010

_____
Robert M. Dow, Jr.
United States District Judge